UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 1:06-CR-113 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| | ) | |
| EARL MCELHENEY | ) | |

## MEMORANDUM AND ORDER

On September 27, 2007, the Court held the sentencing hearing in this case (Court File No. 73). The Court considered Defendant Dr. Norman Earl McElheney's ("Defendant") Motion for Downward Departure/Variance and supporting memorandum (Court File Nos. 45 & 46), Objections to the Presentence Report (Court File No. 47), Sentencing Memorandum (Court File No. 48), Supplement to Objections to Presentence Report (Court File No. 54), Supplement to Defendant's Sentencing Memorandum (Court File No. 59), Second Objection to Presentence Report (Court File No. 63),[1] and two additional Supplements to Defendant's Sentencing Memorandum (Court File Nos. 64 & 70). The United States ("Government") filed a Response to Defendant's Motion for Downward Departure/Variance (Court File No. 52) as well as a Response to Defendant's Second Objection to the Presentence Report (Court File No. 66).

At the hearing Defendant withdrew his factual objections to the Presentence Report. The Court determined the Sentencing Guidelines applicable to Defendant's case, decided Defendant's motions, and consistent with the Court's determinations as stated at the sentencing hearing, after

---

[1]Defendant filed this brief in place of a previous one labeled the same (Court File No. 61). Defendant later moved to strike the first brief (Court File No. 62). The Court finds it unnecessary to strike the first brief, instead the Court will consider the second (Court File No. 63).

carefully considering the arguments of counsel and the factors listed in 18 U.S.C. § 3553(a), imposed a sentence of 135 months (Court File No. 75).

The Court is required to explain the reasons for its sentence. 18 U.S.C. § 3553(c). This memorandum will elaborate upon the reasons stated at the time of the imposition of sentence.

## I. Methodology Used by this Court in Sentencing

### A. *United States v. Booker*

After the United States Supreme Court's ("Supreme Court") decision in *United States v. Booker*, 543 U.S. 220 (2005), the manner in which district courts imposed sentences changed. Prior to the *Booker* decision, sentencing judges followed the mandatory United States Sentencing Guidelines ("USSG"). In *Booker* the Supreme Court considered whether mandatory guidelines where judges were required to make factual determinations that could result in a defendant receiving an enhanced sentence violated the Sixth Amendment. *Id*. at 226. The Court held that the mandatory guidelines did run afoul of the Sixth Amendment. *Id*. at 245. To remedy the violation the Court severed and excised two parts of the statute authorizing the Guidelines, 18 U.S.C. § 3553(b)(1) (the provision making the Guidelines mandatory) and 18 U.S.C. § 3742(e) (the provision that provides for standards of review on appeal, including de novo review for departures from the applicable Guideline range). *Id*. at 245-46. With these excisions the Guidelines were no longer mandatory and binding on sentencing courts. Instead the Guidelines became advisory. *Id*. The modified statute then "requires a sentencing court to consider Guidelines ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well." *Id*. (citations omitted). Sentencing courts were instructed to look to 18 U.S.C. § 3553(a) ("§ 3553(a)") as a whole which requires the sentencing court to consider the applicable Guideline range in determining sentences. *Id*. at 259.

## B.    *United States v. Phelps*

Following the *Booker* decision, this Court issued an opinion in *United States v. Phelps*, 366 F. Supp. 2d 580 (E.D. Tenn. 2005), that explained in general terms the methodology it would employ in sentencing. *Id*. at 584-94. Complying with the holding in *Booker* the Court's methodology requires the Court to "determine the Guidelines range applicable to each case," *id*. at 584; "determine whether any departures from the advisory Guidelines range are appropriate," *id*. at 585; and "determine the appropriate sentence," *id*. at 586. In imposing an appropriate sentence the Court will be guided by § 3553(a)'s general parsimony provision and "will impose a sentence in each case which is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate specific and general deterrence, and provide the defendant with needed training, care, or treatment in the most effective manner." *Id*. at 593.

Ultimately, in arriving at an appropriate sentence the Court must consider and comply with the factors set out in § 3553(a).[2] After taking into account those factors the Court must arrive at a

_____

[2]Section 3553(a) provides that in determining an appropriate sentence the judge must consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed–
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;

sentence that is tailored to the nature and circumstances of the offense and the unique history, background and characteristics of the defendant.

## C.     Caselaw Since *Phelps*

---

(4) the kinds of sentence and the sentencing range established for–

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
>> (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>> (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
> (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement–

> (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
> (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Since *Phelps* was issued, the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") has decided a number of cases concerning the procedures that must be followed by district judges following the *Booker* decision. In one such case, *United States v. Buchanan*, 449 F.3d 731 (6th Cir. 2006), Judge Sutton, in a concurring opinion, explained in detail the procedural requirements a district court should use:

> (1) the judge must make all findings of fact necessary to apply the guidelines to the defendant, *United States v. Orlando*, 281 F.3d 586, 600-01 (6th Cir.2002); *see United States v. Moreland*, 437 F.3d 424, 432 (3rd Cir. 2006);
> (2) the judge must calculate the guidelines sentencing range correctly, *see* 18 U.S.C. § 3742(f)(1); *United States v. Gibson*, 409 F.3d 325, 338-39 (6th Cir.2005);
> (3) the judge must determine whether to grant a downward departure or an upward departure from the guidelines, *see, e.g.*, *United States v. McBride*, 434 F.3d 470, 474-75 (6th Cir. 2006); *United States v. Puckett*, 422 F.3d 340 (6th Cir. 2005);
> (4) the judge must recognize her discretion to issue a sentence that varies from the guidelines, *see Booker*, 543 U.S. at 245-46, 125 S.Ct. 738;
> (5) the judge must consider the § 3553(a) factors in exercising her independent judgment about what an appropriate sentence should be, *id.*;
> (6) the judge must account for any relevant statutory minimum and maximum sentences, *see, e.g.*, *United States v. Van Hoosier*, 442 F.3d 939, 946 (6th Cir. 2006); and
> (7) the judge must give a reasoned explanation for the sentence, *see, e.g.*, *United States v. Jackson*, 408 F.3d 301, 305 (6th Cir.2005); *United States v. Kirby*, 418 F.3d 621, 626 (6th Cir.2005).

*Buchanan*, 449 F.3d at738-39 (Sutton, J., concurring). Although more encompassing than the methodology described in *Phelps*, the guidance provided by Judge Sutton in *Buchanan* is entirely consistent with *Phelps*. Other recent Sixth Circuit case law is also consistent with *Phelps*. *See, e.g.*, *United States v. Williams,* 436 F.3d 706, 708 (6th Cir. 2006) (indicating "sentences properly calculated under the Guidelines [are entitled to] . . . a rebuttable presumption of reasonableness").

**D.    *Rita v. United States***

The latest decision regarding the Sentencing Guidelines by the Supreme Court is *Rita v. United States*, 127 S.Ct. 2456 (2007). The question considered by the Court in *Rita* was whether

it violated the Constitution for the courts of appeal to apply a presumption of reasonableness to sentences within the Sentencing Guidelines. *Rita*, 127 S.Ct. at 2459. The Supreme Court held that it was appropriate for the courts of appeal to apply a presumption of reasonableness to sentences by district courts that fall with the Sentencing Guidelines. *Id.* Although not the question considered by the Court, the Supreme Court provided instructive language regarding the responsibility of sentencing judges in imposing sentences. The Court stated:

> The sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines. He may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless. Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.

*Id.* at 2465 (internal citations omitted).

From the *Rita* decision we see the Supreme Court again reiterating the obligation of sentencing judges to correctly calculate the applicable Sentencing Guideline range but to then impose a sentence based upon 18 U.S.C. § 3553(a).

This emphasis on the necessity of correctly calculating the applicable guidelines was recently commented on by the United States Court of Appeals for the Seventh Circuit ("Seventh Circuit") in a decision it issued following *Rita*. *United States v. Sachsenmaier*, 491 F.3d 680 (7th Cir. 2007). In that case the Seventh Circuit explained:

> [T]he Supreme Court has now expressly endorsed the rebuttable presumption of reasonableness for appellate review of a district court's sentencing decision. The *Rita* decision emphasized that this is a standard for appellate review only. The district courts must calculate the advisory sentencing guideline range accurately, so

that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence. If, however, a district court freely decides that the guidelines suggest a reasonable sentence, then on appellate review the defendant must explain why the district court was wrong.

*Id.* at 685 (internal citations omitted).

Additionally, the Sixth Circuit in *United States v. Liou*, 491 F.3d 334 (6th Cir. 2007), recently elaborated upon *Rita*. The circuit panel stated:

*Rita* exhorts the sentencing judge to satisfy the procedural requirement of setting forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority. The amount of reasoning required varies according to context. *Rita* indicates that when a sentencing judge concurs with the Sentencing Commission's conclusion that a within-Guidelines sentence is appropriate for a given defendant, the explanation for the sentence generally need not be lengthy. When the defendant or prosecutor presents nonfrivolous reasons for imposing a different sentence, however, the judge will normally go further and explain why he has rejected those arguments.

*Liou*, 491 F.3d at 338 (internal quotation marks and citations omitted). This requirement on the part of the sentencing judge to address each nonfrivolous argument or request by a party, while not grounds for automatic vacatur, helps to satisfy the appellate court the sentence is procedurally and substantively sound. *Id*. at 339 n.4.

With the benefit of *Rita* and recent appellate decisions concerning federal sentencing, the Court has determined that the general methodology set out in *Phelps* is consistent with the most recent case authority. Accordingly, this Court will adhere to and continue to employ that methodology.

## II.    **Discussion**

### A.    *Nature and Circumstance of the Offense*

### 1.    Count of conviction

On February 22, 2007, Defendant pleaded guilty before this Court to Count Forty (40) of the Forty-Four (44) Count Indictment charging him with on or about March 25, 2005, knowingly receiving child pornography that had been transported in interstate or foreign commerce by computer, in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) (Court File No. 31).  Defendant's guilty plea was pursuant to a plea agreement (Court File No. 32).  The agreed factual basis filed by the parties in support of the guilty plea stipulated that images of child pornography were found on Defendant's computer at his place of employment, the Center for Sports Medicine and Orthopaedics ("CSMO") in Chattanooga, Tennessee (Court File No. 24).  The factual basis stated a forensic examination of the computer confirmed that the computer was password-protected in the name of Defendant and that he had knowingly accessed the Internet to obtain the images involving children under the age of eighteen, and such images had been transported in interstate commerce.  *Id.*

### 2.    Other Offense Related and Relevant Conduct

Following his guilty plea, the United States Probation Department prepared a Presentence Report ("PSR") on Defendant and his sentencing hearing was set for June 21, 2007 (Court File No. 31).  After Defendant filed objections to the Presentence Report, the United States ("Government") moved to continue the sentencing hearing based upon the Probation Office's request to revise the Presentence Report (Court File No. 55).[3]  The Court granted the Government's request for a

---

[3]  Specifically, two days before the scheduled sentencing hearing, the Probation Office wished to revise paragraph 34 of the PSR. In the original PSR, the Probation Officer increased Defendant's base offense level by three since the instant offense involved at least 178 images and 23 videos depicting child pornography, pursuant to USSG § 2G2.2(b)(7)(B). The Probation Officer wished to revise the PSR pursuant to USSG Application Note 4(B)(ii) which provides,  "each video, video-clip, movie, or similar recording shall be considered to have 75 images. If the length of the recording is substantially more than 5 minutes, an upward departure may be warranted." Because

continuance and the Probation Office issued a revised Presentence Report ("PSR").[4]

The 2006 edition of the United States Sentencing Guidelines ("USSG") was used in calculating Defendant's Guidelines' sentence. The PSR described in detail the facts applicable to the Offense Conduct. PSR, ¶¶ 10-21. Defendant's offense was discovered when he requested assistance from information technology specialists at CSMO, his place of employment, for his computer (apparently, his work computer). PSR, ¶ 10. The computer was randomly rebooting. *Id*. Defendant asked the information technology technician to "wipe" the hard drive and clean it. *Id*. Instead of "wiping" the hard drive, the technician tried to diagnose the problem. PSR, ¶ 11. In checking for viruses he found image and video files under a folder labeled "music." *Id*. When the technician opened one of the files he saw a video of a child engaged in sexual activity with an adult. *Id*. He opened another file and saw a similar video. *Id*. The technician thereafter reported what he had found to his supervisor. PSR, ¶ 12. The supervisor himself examined Defendant's computer, accessed the child pornography files and copied them to a compact disc. *Id*. CSMO's legal counsel was made aware of the child pornography discovered on Defendant's computer and reported this information to the Federal Bureau of Investigation ("FBI"). *Id*. Both the compact disc containing the files copied from Defendant's computer and the hard drive from the computer itself were surrendered to the FBI. *Id*. After the technician discovered the child pornography but before the compact disc and computer hard drive were provided to the FBI, Defendant ran on his office

_____

the defendant possessed 23 videos, the number of images exceeded 600 and the Probation Officer increased Defendant's base offense level by five in the revised PSR, pursuant to USSG § 2G2.2(b)(7)(D). The increase of Defendant's offense level in paragraph 34 is the only difference between the original PSR and the revised PSR.

[4] All references to the PSR are to the revised PSR, which is dated June 21, 2007.

computer a Norton product designed to erase computer hard drive contents. *Id*. A subsequent forensic examination of the computer discovered that 20 of 23 videos depicting child pornography had been deleted. *Id*.

When the compact disc and the hard drive were examined by personnel of the FBI, at least 80 images of child pornography and 23 video files depicting children engaged in sexual activity were detected. PSR, ¶ 13. Several e-mails were also discovered that discussed child pornography. *Id*. One of these emails contained an image depicting child pornography. *Id*.

Agents of the FBI determined the images and videos were stored on the computer from January 7, 2005 through March 25, 2005. PSR, ¶ 14. A comparison of Defendant's work schedule at CSMO with the dates the images and videos were stored showed that he was at CSMO when each image or video was stored. *Id*. Interviews with employees at CSMO revealed that Defendant spent a great deal of time on his computer and that he frequently kept patients waiting in examination rooms because he was on his computer. *Id*. Interviews with information technology personnel disclosed they had found adult pornography on Defendant's computer in the past, and Defendant was warned about this at a staff meeting. *Id*. Following the discovery of the child pornography on Defendant's CSMO computer, he was terminated from CSMO. PSR, ¶ 15. Thereafter, he opened his own medical practice. *Id*.

On October 24, 2006, Defendant was indicted by a federal grand jury (Court File No. 1). At his initial appearance, he was arraigned and released on an appearance bond (Court File Nos. 2 & 3). One of the bond conditions specifically prohibited Defendant from securing residential internet access (Court File No. 4). While on bond Defendant on November 2, 2006, purchased a subscription to Home Collection 1002, a child pornography service, through his Comcast Internet

service at his residence. PSR, ¶ 16. Agents of the FBI on December 4, 2006, executed a search warrant at Defendant's residence, arrested Defendant, and seized his laptop computer. *Id.* A search of that computer revealed it contained at least 64 images of child pornography. *Id.* On December 8, 2006, the pretrial services officer filed a petition for action on conditions of his pretrial release alleging Defendant did access the internet at his residence in violation of his bond conditions and allegedly committed new crimes while on release (Court File No. 11).

Following Defendant's arrest he was housed at the Hamilton County, Tennessee Jail. After a hearing on the petition from pretrial services Magistrate Judge Lee ordered Defendant's detention, finding he had violated the terms of his release (Court File No. 13).

Following his arrest on December 4, 2006, Defendant called the office coordinator of his new practice, Peggy L. Davis. PSR, ¶ 16. He informed her the FBI had searched his home. *Id.* He instructed her to remove his computer from his office. *Id.* Ms. Davis complied with Defendant's instructions and moved the computer from Defendant's private office into a common area in the practice. *Id.* The following week Defendant's sister, Norma Robertson, met with Ms. Davis, obtained a key to the practice, went to the practice, and removed the computer. PSR, ¶ 17. She delivered the computer to Defendant's then-counsel. *Id.* In a subsequent telephone conversation Defendant and Ms. Davis discussed in cryptic terms a hard drive which Ms. Davis had removed from a computer. PSR, ¶ 19. FBI agents executed a search warrant and obtained Defendant's office computer. PSR, ¶ 20. On December 20, 2006, Defendant's then-counsel surrendered an additional laptop and hard drive. *Id.* An examination of these computers and the hard drive discovered an additional 34 images of child pornography. *Id.*

The author of the PSR described some of the images found. PSR, ¶ 21. According to the

author, among the videos discovered on Defendant's computers was a video of a child being subjected to anal intercourse, a child aged three years of age or younger in a sexually suggestive pose (with no penetration depicted), and a female child being forced to perform oral sex on an adult male (with that male forcing the head of the female child down on his penis, while the child appears to be crying). *Id*.

**B.** *History and Characteristics of Defendant*

The PSR contains information regarding Defendant's personal history, background and characteristics. PSR, ¶ 49-69. Defendant submitted a Sentencing Memorandum that contains additional information (Court File No. 48). Additionally, on July 20, 2007 Defendant sent a personal letter to the Court. The Government does not dispute the factual matters relating to his personal history and background. Therefore the Court used all three sources.

Defendant is a medical doctor with a specialty in orthopaedic surgery. He has practiced in that specialty almost his entire professional career in Chattanooga, Tennessee.

**1. Defendant's early home environment**

Norman Earl McElheney was born in Atlanta, Georgia on September 29, 1956. He is now 51 years of age. His childhood was spent in a stable, wholesome and supportive home. He was the first of two children born to his parents. His father was an industrial engineer. His mother was an elementary school teacher. He has one younger sister, Norma McElheney Robertson.

In his youth he was active in community and church activities. He became an Eagle Scout with Boy Scout Troop 67 in September 1971. According to his Sentencing Memorandum, his first job was sacking groceries at a local grocery store but as soon as he was old enough, he went to work at a drug store.

In 1974, he joined "Amigos de las Americas" in high school and was sent to Guatemala to give vaccinations and aid to the poor.

### 2.      Secondary and Post-secondary education

After graduating from high school Defendant remained in Georgia to continue his education. From high school, Dr. McElheney enrolled at Emory University in Atlanta, Georgia and majored in chemistry.  He then attended Georgia State University for two years while he pursued a Master's Degree in immunology.  He left Georgia State University before completing the master's program because he had been accepted to the Medical College of Georgia in Augusta.  He received his degree of Doctor of Medicine from the Medical College of Georgia on June 8, 1985.  According to his letter, he graduated in the top ten percent of his class.  He then moved to California to complete his residency in orthopaedic surgery at the University of California at San Francisco from 1985 to 1991. During his residency, Dr. McElheney worked at the Shriner's Hospital for Crippled Children and at Children's Hospital in Oakland.

### 3.      Immediate family

Dr. McElheney married Dr. Kimberly Carlton in April 1985, and they have two sons, ages 17 and 13, and one daughter, age 15.  When Defendant completed his residency in California he and his wife moved to Chattanooga where he found a job as an orthopaedic surgeon.  The marriage experienced some stress and Dr. McElheney and his wife were divorced in 2007, after attempting marriage counseling and being separated for almost two years.  According to his letter, Defendant's "unfortunate obsession to this unsavory subject" coincided with "the stressful times [he] was having with [his] marriage and medical practice."

### 4.      Hobbies, interests and pastimes

The Sentencing Memorandum described Dr. McElheney's interests. According to that memorandum he enjoyed his work as an orthopaedic surgeon. "When he was not using his spare time to catch up on work, he enjoyed being out on the lake with his children and liked going to his farm where he would ride his tractor and bush hog. Dr. McElheney exercised at a local health club every day and enjoyed playing with his 3 dogs" (Court File No. 48, p. 2).

Dr. McElheney's practice occupied most of his time. He worked for the Center for Sports Medicine and Orthopaedics in Chattanooga from September 1991 until June 2005, when the conduct giving rise to this conviction was discovered. After he left CSMO he opened a solo practice in June 2005 but that solo practice closed upon his conviction for this offense. Dr. McElheney was a licensed physician in both Tennessee and Georgia.[5] He was a member of many professional societies.[6] According to the Sentencing Memorandum he provided sports medicine services for many sports teams and sporting events.[7]

Dr. McElheney performed a particular type of surgery, called computer assisted Total Knee

---

[5] Dr. McElheney voluntarily surrendered his medical licenses after being charged in this case.

[6] Dr. McElheney was a member of Alpha Omega Alpha Alumnus, American Medical Association, Chattanooga/Hamilton County Medical Society, ETSU Clinical Assistant Professor in the Department of Family Medicine, Georgia Workers Compensation Panel of Physicians, IMPACT/AMPAC, Leroy C. Abbott Orthopaedic Society, Medical College of Georgia Alumni Association, Medical Foundation of Chattanooga, Southern Medical Association, Southern Orthopaedic Association, Tennessee Medical Association, Tennessee Orthopaedic Society, University of California, San Francisco (UCSF) Alumni Association, Member Inman-Abbott Society (UCSF), Diplomat of the American Board of Forensic Examiners Active Member, American Board of Independent Medical Examiners.

[7] Dr. McElheney provided sports medicine services for the Chattanooga Lookouts AA Professional Baseball Club, Chattanooga State Technical Community College, Lee University, Tennessee Wesleyan College, thirteen private and public high schools, numerous sports tournaments and events, and ongoing sports medicine services through a free Saturday morning sports medicine clinic three months a year.

Arthroplasty ("TKA"). According to his letter, Dr. McElheney carried on a unique practice. He "chose to treat patients with and without insurance coverage, it made no difference because [he] could help. [He] treated people from all walks of life and with various musculoskeletal problems. [He] took care of it all and loved what [he] did." According to the Sentencing Memorandum Dr. McElheney volunteered his medical skills from June 2004 until August 2006, with Project Access, an initiative of Chattanooga-Hamilton County Medical Society that provides health care to uninsured, low-income residents. One of the letters submitted on his behalf verified Dr. McElheney treated patients with no ability to pay. ("He has saved my leg on two occasions. I am a widow and have no insurance and Dr. [McElheney] did two surgeries at no cost to me and also saw to it that the hospital charges were taken care of.").

### 5. Collateral consequences of conviction

Both the Sentencing Memorandum and Dr. McElheney's letter discuss in considerable detail and with considerable force the collateral consequences he has already faced as a result of this offense. In his letter he states: "As the result of my involvement, I lost my employment with the medical practice I had been with for fourteen years. My twenty-one year marriage fell apart, and as a result, I have been living apart from my three children. Physically, mentally, and financially, the stress has been tremendous. . . . I have paid a high price and shamed myself and my family." The Sentencing Memorandum elaborates upon the same theme. It says Defendant has already suffered much more than most defendants. Dr. McElheney has lost his family and has very little if any contact with his children. He has lost his patients, his medical practice, his job, and his health insurance. He has surrendered his medical licenses and is losing the skills that made him a great surgeon. He has suffered damage to his reputation both as a doctor and member of the community.

15

He has lost his farm, his car, and his home. He has endured the negative publicity surrounding his case on television, the internet, and in the newspaper. He will be stigmatized for the rest of his life. He has suffered major depression and diverticulitis. Since being incarcerated in December 2006, he has been housed in the same protective custody at CCA Silverdale as inmates with disciplinary problems for "his own protection" (Court File No. 48, p. 3). He has suffered a severe financial loss, being unable to pay his mortgage and his children's school tuition. Dr. McElheney went from making a very comfortable doctor's salary to being incarcerated and unemployed. The Sentencing Memorandum quotes from a letter written by his sister to demonstrate what Defendant has lost as a result of this offense:

> He will pay the price for this mistake for the rest of his life. He has lost his family, his medical practice and his career as a medical doctor. He must move from the town he has lived in for 15 years and the friends he has made. He will forever be labeled in society as a criminal. It is questionable whether he will ever be able to practice medicine again and earn a living as a doctor. This is enough punishment. . . . He has lost everything he ever valued and worked for in life.

(Court File No. 48, pp. 3-4).

At his sentencing hearing, Defendant addressed the Court, and reiterated he has lost "everything," including his family, career, home, and dogs. He emphasized he received punishment and collateral damage "beyond imagination," and is suffering physically, mentally, and financially.

### 6. Defendant's Remorse and Acceptance of Responsibility

The PSR awarded Defendant credit for acceptance of responsibility. In his letter Defendant expressed remorse and accepted responsibility for his conduct:

> However, I accept full responsibility for my actions. I do not blame anyone else but myself . . . . Nevertheless, I am genuinely sorry that my obsession hurt so many other people who are my family, friends, and patients who trusted me . . . . I am so deeply sorry for my actions and accept full responsibility . . . . I would like to apologize to my ex-wife . . ., my children, . . . , my parents, my sister, my in-laws, my medical

practice, my colleagues, Your Honor for taking up your time and the Court's time.
I want to apologize to the United States of America.

While addressing the Court at his sentencing hearing, Defendant also apologized to his family, friends, patients, and the Court for his actions. He described himself as a good person who did very bad things, but also insisted he has never harmed anyone and never will.

The Sentencing Memorandum argues Dr. McElheney regrets committing this offense and has accepted responsibility for his conduct. Dr. McElheney was involved in a stressful marriage, separation, and divorce around the time of this offense. His work environment was also dysfunctional, causing a high amount of stress. Dr. McElheney's offense was very out of character. He has no criminal history.

### 7.     Defendant's cooperation

Defendant represents he cooperated with authorities regarding this offense. He points to his asking the Court to order a psychosexual examination and his full cooperation with Dr. Bertin Glennon. According to Dr. McElheney the psychological sex risk assessment was favorable to him. The report was submitted as a sealed exhibit at the motion hearing held May 7, 2007, before Magistrate Judge Lee.

Dr. McElheney met with FBI agents and provided them with as much information as he could about the offense. He attempted to obtain a substantial assistance departure by providing information which involved other criminal acts. However, because of the small economic impact the crimes had, the Government has not pursued that information.

Defendant has no prior criminal record. He has no history of substance abuse. His physical and mental health are good.

### 8.     Risk of recidivism

Following the entry of his guilty plea, Defendant asked for a psychosexual examination. This examination was ordered by the Court.[8]   That examination reported that Defendant does not suffer from any personality disorders.  The report stated nothing was detected "indicative of any 'hands-on' sexual offense."  The author of the report said Defendant "does not, at this time, appear to be a threat of sexual contact violence.  His primary sexual partner pool is indicated to be adult females."  Finally, the report opined Defendant was at a moderate to high risk to reoffend.  PSR, ¶ 58.

## C.    *Calculation of Guidelines*

### 1.    **Guidelines' Calculation in PSR**

Based upon the offense of conviction, receiving child pornography, Defendant was assigned a base offense level of 22 pursuant to USSG § 2G2.2(a)(2).  PSR, ¶ 29.  Because Defendant did not intend to traffic in or distribute the child pornography, his offense level was reduced by two points. PSR, ¶ 30.  Two points were added pursuant to USSG § 2G2.2(b)(2) since several of the images

---

[8]This psychosexual examination was locally conducted.  However, it did not include a penile plethysmograph test.  And during the course of this examination Defendant did not undergo a polygraph examination.  Pleythysmograph testing involves measuring the sexual arousal to various stimuli. *United States v. Wilson*, 172 F.3d 50 (Table) (6th Cir. 1998), *available at* 1998 WL 939987, *2.  It is an objective test of a person's arousal although it has been criticized.  *See, e.g.*, *United States v. Powers*, 59 F.3d 1460, 1471 (4th Cir. 1995).

> Penile plethysmograph testing is a procedure that involves placing a pressure-sensitive device around a man's penis, presenting him with an array of sexually stimulating images, and determining his level of sexual attraction by measuring minute changes in his erectile responses.  Courts have previously recognized that plethysmograph testing can be helpful in the treatment and monitoring of sex offenders.

*United States v.  Lee,* — F.3d. ---, No. 06-5848, 2007 WL 2669124, *5 n.1 (6th Cir. Sept. 13, 2007).
In the Sixth Circuit sentencing courts may order psychiatric or psychological examinations, including psychosexual examinations that include the plethysmograph test.  *United States v. Kennedy*, No.  05-6586,  — F.3d ---, 2007 WL 2403660, *3 (6th Cir. Aug. 24, 2007).

recovered from Defendant's computers involved prepubescent minors. PSR, ¶ 31. Four points were added under USSG 2G2.2(b)(4) because one of the videos depicted an adult male forcing a female minor to perform oral sex on him. PSR, ¶ 32. The PSR characterized this as sadistic behavior since the child appeared to be crying and the adult male was forcing the child's head down on his penis. *Id.* Two points were added pursuant to USSG § 2G2.2(b)(6) because a computer was used in the possession, transmission and receipt of the child pornography. PSR, ¶ 33. At least 178 images and 23 videos depicting child pornography were found on Defendant's computers. PSR, ¶ 34. Since each video is considered to have 75 images, the instant offense involved in excess of 600 images and the offense level was increased by five pursuant to USSG § 2G2.2(b)(7)(D). *Id.* Defendant was also given two additional points for obstruction of justice.[9] PSR, ¶ 37. All of these characteristics added to the base offense level results in an adjusted offense level of 35. PSR, ¶ 38. Even though Defendant was given an obstruction of justice adjustment, the PSR still assigned him a two level downward adjustment for acceptance of responsibility. PSR, ¶ 41. Based upon these calculations, Defendant's total offense level is 33. PSR, ¶ 44. Defendant has no criminal history so he falls in criminal history category I. His resulting guideline range is 135 to168 months.

The statutory maximum term of imprisonment is 20 years with a statutory mandatory minimum term of imprisonment of five years. 18 U.S.C. § 2252A(b)(1). The maximum fine is $250,000, pursuant to 18 U.S.C. § 3571. The offense of conviction carries a maximum term of supervised release of any term of years or life. 18 U.S.C. § 3583(k).

### 2.    Objections to Guidelines' Calculations

---

[9] The PSR sets out actions on Defendant's part thought to constitute obstruction of justice. PSR, ¶¶ 23-24.

Defendant raised various objections to the PSR, most of which he withdrew at the sentencing hearing (Court File Nos. 47, 54 & 63).[10] The only remaining objection to the Guidelines is Defendant's contention that Application Note 4(B)(ii) of USSG § 2G2.2(b)(7), which attributes 75 images to each video, violates his right to due process, his rights under the Sixth Amendment, and his right to equal protection of the laws. The change made in the revised PSR applied Application Note 4(B)(ii) of USSG § 2G2.2(b)(7) to increase Defendant's base offense level by five instead of three as originally calculated. In its brief, the Government simply contends the Guidelines are merely advisory, so the Court is free to disregard any provision or application note it deems unreasonable. Additionally, the Government indicated it would be content to let the Court consider the content of the videos found on Defendant's computers first-hand, in determining the appropriate sentence in this case.

The Court finds this provision is reasonable under the circumstances. It is reasonable a video would not be treated the same as a photograph because the video contains an untold number of images. And it would be unfair to defendants to treat each frame of the video as a new image because the human eye does not process each frame. There has to be a happy medium, and the Sentencing Commission's decision to equate one video with 75 images is a rational manner of addressing it. Shortly after Defendant's sentencing, the Sixth Circuit noted that this conversion factor provides guidance to courts in determining the number of images. *United States v. Geerken*,

---

[10] The objections Defendant withdrew included: the two-level enhancement for prepubescent minors pursuant to USSG § 2G2.2(b)(2) (PSR ¶ 31); the four-level enhancement for images depicting sadistic behavior pursuant to § 2G2.2(b)(4) (PSR ¶ 32); the two-level adjustment for obstruction of justice (PSR ¶ 37); PSR ¶ 12 is incorrect in that he did not run a Norton product on his computer to erase its hard drive contents; he accessed child pornography that was already on his computer but he did not put it there; and PSR ¶¶ 15 & 67 are incorrect in that he was not terminated but rather resigned after being given the choice to resign or be terminated.

No. 06-3987, — F.3d —, 2007 WL 3051235, *4 (6th Cir. Oct. 22, 2007). The Court then held that using the 75-to-1 conversion factor is not arbitrary and did not lead to a unreasonable sentence for the defendant in that case. *Id.*

Having considered Defendant's objection and denied it, the Court found the facts contained in the PSR were accurate and the PSR had computed the guidelines correctly.

### 3. Motions for Departure from Guidelines

After the Court has preliminarily determined the applicable guideline range, it must consider whether a departure from that guideline range is warranted. The Sentencing Commission recognized that it was impossible to cover every conceivable method of committing an offense. Because of this it adopted what it called the heartland approach. "The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." USSG, Chapter 1, Part A, 4 (b).

This policy statement requires the Court to determine whether this is an atypical case. Defendant has not provided any argument to establish this case is atypical. If fact, it would be hard for Defendant to do so because in this Court's experience both the offense conduct and the defendant are typical of what the Court sees in cases of child pornography. The Court does not see either the conduct at issue here nor the personal circumstances of Defendant as being outside of the norm for child pornography cases that have come before the Court.

Typically, defendants in these cases are first offenders, highly educated, middle aged, with solid work histories. These defendants all experience public embarrassment, loss of family and

friends, and diminution of income. Dr. McElheney's education is higher than others, his income was greater, and he was a member of a profession. However, these are merely differences of degree of harm suffered by the typical defendant convicted of this offense and not kind.

Defendant having failed to provide the Court with any reason to depart and the Court not detecting anything atypical about this case, the Court **DENIED** Defendant's motion in so far as it was premised on a downward departure argument.

### 4.        Determination of Applicable Guidelines

At Defendant's sentencing hearing held on September 27, 2007, the Court determined the revised guidelines sentencing range was 135 to 168 months based on an adjusted offense level of 33 and criminal history category of I. The Court then considered the factors in 18 U.S.C. § 3553(a) to determine an appropriate sentence and Defendant's arguments for a non-Guideline sentence.

### a.        Arguments for Non-Guideline Sentence

Although Defendant had denominated his argument as both a motion for downward departure and for a variance, in essence what Defendant is requesting is a non-Guideline sentence. Defendant also urges the Court to impose a sentence below the mandatory minimum sentence of five years. Following *Booker*, sentencing courts are not bound by the sentencing guidelines and have the authority to impose a non-guideline sentence if the court deems such a sentence appropriate. *Booker* requires the sentencing court to consult and consider the guidelines but the court is required to comply with 18 U.S.C. §3553(a).

Defendant argues the facts and law show a sentence below the guidelines is warranted. Defendant contents the particular facts of his case do not justify the guideline sentence. Defendant points out the dates alleged in the indictment only cover a three month period, Defendant never

attempted to contact any children, Defendant has no prior criminal history, and Defendant has already suffered much more harm than most defendants.

Defendant also argued that the Court can impose a sentence significantly below the Guidelines range and that to do otherwise would violate Defendant's constitutional rights. First, Defendant urged the Court to not impose a mandatory minimum sentence on the grounds that the Court can apply what is known as the "safety valve" and because allowing sentencing below the mandatory minimum only on the Government's motion violates separation of powers. Second, Defendant argued the Court can impose a sentence well below the Guidelines range without requiring extraordinary circumstances. Third, Defendant argued there is an unconstitutional disparity between federal statues penalizing possession of child pornography and receipt of child pornography. Fourth, Defendant argued a Guidelines sentence would violate the Eighth Amendment to the United States Constitution.

### i.       Applicability of mandatory minimum sentence

Defendant contended the Court did not have to impose a mandatory minimum sentence because the safety valve should be applied to his case and the exclusive ability of the Government to move for a sentence below the mandatory minimum violates the separation of powers doctrine.

Defendant objects that the safety valve, 18 U.S.C. § 3553(f), was not applied to him. The safety valve is a Congressional enactment meant to afford certain individuals convicted of drug trafficking offenses a lesser sentence than they otherwise would face. Defendant acknowledges that his case does not involve one of the offenses enumerated in the statute. Other than not being convicted of an offense listed in § 3553(f), Defendant meets all the criteria of the safety valve.

In support of his argument that the Court has the authority to apply the safety valve in this

case Defendant relies upon three cases from other circuit courts of appeal, *United States v. Mashek*, 406 F.3d 1012 (8th Cir. 2005); *United States v. Warnick*, 287 F.3d 299 (4th Cir. 2002); and *United States v. Mertilus*, 111 F.3d 870 (11th Cir. 1997). An examination of these cases reveals they do not support Defendant's proposition. All three of these cases involve drug trafficking where the defendant was sentenced pursuant to the drug guidelines. Under the applicable drug guideline in those cases, USSG § 2D1.1, a two-level reduction was authorized under the safety valve. Another guideline, USSG § 5C1.2, describes the statutory category of offenses for which Congress has authorized departures below the mandatory minimum. The three cases cited by Defendant simply state since § 2D1.1 authorizes the two level reduction then sentencing courts must apply it.

Obviously, § 2D1.1 is not applicable here. Congress has determined the mandatory minimum for this offense. It is clearly well within the province of Congress to do so. Congress has made a policy judgment to deviate from the mandatory minimum for certain drug cases. It has not made that policy decision for defendants convicted of receiving child pornography. Under our system of government, such policy decisions are relegated to the legislative branch, not the courts.

Defendant also argued there is a violation of the separation of powers doctrine because the Court cannot impose a sentence below the statutory minimum unless the Government moves for a substantial assistance departure under USSG § 5K1.1. Defendant tried to obtain a substantial assistance departure by providing information to the FBI but the government did not pursue the information. The Government's failure to file a motion for a substantial assistance departure is proper as long as it is not based on an unconstitutional motive, such as the defendant's race or religion. *United States v. Rashid*, 274 F.3d 407, 417 (6th Cir. 2001) (citing *Wade v. United States*, 504 U.S. 181, 185-86 (1992)). There is no indication here of unconstitutional motives for the

Government not filing a substantial assistance motion.

Defendant contends the Court can impose a sentence below the statutory minimum even without the government moving for a substantial assistance departure because the alternative violates the separation of powers doctrine. This contention is without merit. *United States v. MacEwan*, 445 F.3d 237, 250-53 (3d Cir. 2006); *United States v. Santoyo*, 146 F.3d 519, 524 (7th Cir. 1998). Under 28 U.S.C. § 994, "The [Sentencing] Commission shall assure that the guidelines reflect the general appropriateness of imposing a lower sentence than would otherwise be imposed, including a sentence that is lower than that established by statute as a minimum sentence, to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." The Seventh Circuit explained that Congress allowed the Sentencing Commission to establish procedures to implement its policies, and the "Commission deemed a Government-motion requirement in USSG § 5K1.1 to be the best way to effectuate Congress's goals." *Santoyo*, 146 F.3d at 524.

Likewise, the Sixth Circuit has rejected constitutional challenges similar to Defendant's. The Sixth Circuit has noted that Congress may establish mandatary sentences that eliminate discretion in sentencing judges. *United States v. Dumas*, 934 F.2d 1387, 1389 (6th Cir. 1990) (citing *Mistretta v. United States*, 488 U.S. 361, 364 (1989)); *see also Chapman v. United States*, 500 U.S. 453, 467 (U.S. 1991) ("Congress has the power to define criminal punishments without giving the courts any sentencing discretion."). In addition, since "defendants have no constitutional right to the benefit of downward departures under the Guidelines, they cannot challenge the manner in which Congress has provided it." *United States v. Levy*, 904 F.2d 1026, 1035 (6th Cir. 1990) (rejecting alleged violations of due process and cruel and unusual punishment). Furthermore, it is reasonable for the

Government to have the exclusive ability to move for a substantial assistance departure because "the government is in the best position to supply the court with an accurate report of the extent and effectiveness of the defendant's assistance." *Id.* at 1036. Consistent with these reasons, the Court rejected Defendant's contention that the Court's inability to impose a sentence below the mandatory minimum except on motion of the government is a violation of separation of powers.

### ii. Substantial variances require extraordinary circumstances

Defendant argued it is inconsistent with *Booker* "to require a sentence which constitutes a substantial variance from the Sentencing Guidelines to be justified by extraordinary circumstances or to presume that a within the guidelines sentence is reasonable" (Court File No. 64, p. 3). However, this is not the law in the Sixth Circuit. If the Court wished to impose a sentence substantially below the Sentencing Guidelines, it would have to "offer a compelling justification based on the relevant § 3553(a) factors that is in proportion to the extent of the variance." *United States v. Borho*, 485 F.3d 904, 912 (6th Cir. 2007). The compelling justification cannot be based on factors already taken into account by the Guidelines. *See id.* (holding unreasonable an extraordinary variance based on factors such as the defendant's lack of criminal history, his health conditions, and the lack of improper interactive behavior with children).

It is not inconsistent with *Booker* to involve the Guidelines in determining a sentence. The Court must base its sentence on the relevant § 3553(a) factors, one of which requires consideration of the Guidelines range, and the Guidelines purport to account for most or all of the § 3553(a) factors. *United States v. Davis*, 458 F.3d 491, 496 (6th Cir. 2006). When the Sixth Circuit reviews cases for reasonableness, it applies a form of proportionality review in which the farther a sentence departs from the Guidelines, the more compelling the justification based on § 3553(a) factors must

be. *Id.* In *Rita*, the Supreme Court left open the question of whether it is proper for the courts of appeals to require compelling justifications based on the strength of non-Guidelines sentences, as the Sixth Circuit required in *Davis*. *Rita*, 127 S.Ct. at 2467. The Supreme Court will address that requirement in *United States v. Gall*, No. 06-7949. For now, the Court is properly following Sixth Circuit precedent by not imposing substantial variances without extraordinary circumstances, and in this csae the Court did not believe any variance was warranted.

### iii. Disparity between possession and receipt of child pornography

Defendant argued there is a disparity between possessing child pornography and receiving it and that disparity violates due process. Defendant pleaded guilty to violating 18 U.S.C. § 2252(A)(2)(A), which penalizes any person who "knowingly receives or distributes" child pornography, an offense punishable by imprisonment of between five and 20 years. § 2252(A)(b)(1). In contrast, violators of § 2252(A)(5)(B), which penalizes any person who "knowingly possesses" material containing child pornography, are subject to imprisonment for no more than 10 years. § 2252(A)(b)(2). Defendant argues the different terms of imprisonment violate due process.

The Court construes Defendant's objection as alleging a violation of the substantive component of the Due Process Clause in the Fifth Amendment to the United States Constitution. [11] "The substantive component of the Due Process Clause protects fundamental rights that are so implicit in the concept of ordered liberty that neither liberty nor justice would exist if they were sacrificed." *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 499 (6th Cir. 2007) (citing *Palko v. Conn.*, 302 U.S. 319, 325 (1937)) (construing Due Process language in Fourteenth Amendment).

---

[11]No person shall "be deprived of life, liberty, or property, without due process of law."

Legislation is reviewed under the strict-scrutiny test if it infringes on a fundamental right. *Id.* There is no fundamental right at issue here. Therefore, the Court will use a rational-basis standard of review. *Id.* at 501. Such review requires the Court to ask if the statue is "rationally related to legitimate government interests," a highly deferential standard. *Id.*

There is a rational basis for the distinction between receiving child pornography and possessing it. Possession is passive and receiving is more active. It is rational for Congress to seek to eliminate the market for child pornography, that is, to stop trafficking in it. Someone who merely possesses child pornography is not as active in the market as someone who receives child pornography, so there is a rational basis for Congress's decision to impose different sentences for those offenses. In addition, Congress is permitted to impose different sentences without violating the Fifth Amendment's Equal Protection Component of the Due Process Clause. *Rodriguez-Padron v. INS*, 13 F.3d 1455, 1459 (11th Cir. 1994). Accordingly, the Court rejected Defendant's argument.

### iv.    Eighth Amendment

Defendant argued a Guidelines sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment. The "narrow proportionality principle," which applies to noncapital crimes, prohibits sentences that are grossly disproportionate to the severity of the crime. *Ewing v. California*, 538 U.S. 11, 20-21 (2003). Aside from capital punishment, successful challenges to the proportionality of sentences are "exceedingly rare." *Id.* at 21.

The Eighth Circuit recently addressed and rejected an Eighth Amendment challenge by a defendant convicted of receiving child pornography. In *United States v. Weis*, 487 F.3d 1148, 1153 (8th Cir. 2007), the court explained why receiving child pornography is a "grave offense":

> Weis's attempt to minimize the harm associated with his crime fails. Weis argues
> this crime is a "non-violent offense," noting he "did not perpetrate the admittedly

highly destructive primary harm on the children depicted in the images." This attempt to divorce the consumption of child pornography from the harm inflicted upon its victims has been rejected by Congress, *see* Child Pornography Prevention Act of 1996, Pub. L. No. 104-208 § 121, 110 Stat. 3009, 3009-27 (1996) ("[T]he existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children."), and the Supreme Court. *See Osborne v. Ohio*, 495 U.S. 103, 109-11, 110 S. Ct. 1691, 109 L. Ed. 2d 98 (1990) (acknowledging that possession of child pornography creates a market for its production, which results in the exploitation of children). In addition, this court has recognized that defendants guilty of receiving child pornography victimize the children depicted in the pictures. *See United States v. Rugh*, 968 F.2d 750, 756 (8th Cir. 1992) (deciding that the primary victims in a receipt of child pornography case were the identifiable children in the images, not only society at large). We cannot ignore the victims harmed by Weis's criminal conduct, and there are many victims.

In a decision issued shortly after sentencing in this case, the Tenth Circuit held that in light of Supreme Court precedent on proportionality, a sentence for possessing child pornography within the Guidelines does not violate the Eighth Amendment. *United States v. Soule*, No. 07-8001, 2007 WL 2962373, *3 (10th Cir. Oct. 10, 2007); *see also United States v. MacEwan*, 445 F.3d 237, 249-50 (3d Cir. 2006) (rejecting Eighth Amendment challenge for repeat offender); *United States v. Gross*, 437 F.3d 691, 694 (7th Cir. 2006) (same).

Defendant's case is not one of the exceedingly rare cases where a sentence is constitutionally disproportionate.

### v.      Unwarranted Disparity

Defendant argues a below-guideline sentence is appropriate to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Defendants cites a number of cases from this district and the Sixth Circuit where defendants convicted of offenses involving child pornography received lower sentences than Defendant. Section 3553(a)(6) states "the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct" is a factor in sentencing.

Guidelines sentences are a mechanism for increasing uniformity. *Kirchhof*, 2007 WL 2827572 at *6 (citing *Rita v. United States*, 127 S.Ct. 2456, 2467 (2007)). That is why the Sixth Circuit reviews disparities by starting with the guidelines, not the sentences received by other individual defendants. *Id.* It is also why "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006).

The Court should discuss this factor with particular care in cases where it sentences a defendant to a term significantly different than similar offenders. *See United States v. Goff*, No. 05-5524, --- F.3d ---, 2007 WL 2445637, *8 (3d Cir. Aug. 30, 2007). However, Defendant's sentence is not higher than those of similar offenders. Defendant's sentence is higher than it otherwise would have been is because the offense level was adjusted to account for various aspects of the offense conduct, including the number of photographs and videos and their conduct and Defendant's actions while on pretrial release.

The comparisons Defendant cites are distinguishable. For instance, in *United States v. Bridgewater*, the defendant pleaded guilty under a different section of the statute and received the statutory maximum of 10 years. That case does not provide a proper comparison because it involves a different offense. *See United States v. Fink*, No. 06-3436, — F.3d —, 2007 WL 2530312, *4 (6th Cir. Sept. 7, 2007) (noting that comparisons must involve the same offense). Defendant relies on *United States v. Boyden*, No. 06-20243, 2007 WL 1725402 (E.D. Mich. June 14, 2007) for the proposition that the Court should look at state cases, and he cites a number of Tennessee state cases to suggest a lower sentence is appropriate. However, disparities between federal and states

sentences are not the proper comparison. *United States v. Schmitt*, 495 F.3d 860, 863 (7th Cir. 2007) ("[A]djusting federal sentences to accord with those imposed for similar crimes in state court would undermine the goal of uniformity within the federal system"). In Defendant's case, by following the Guidelines, the Court has imposed a sentence that fits the particular circumstances of Defendant's case, in accordance with the factors outlined in § 3553(a).

### b. Considerations of § 3553(a) Factors

Next the Court determined the appropriate sentence pursuant to the directions set out in § 3553(a). The Court endeavored to reach a sentence that satisfies the needs identified in § 3553(a)(2) and the unique history and characteristics of Defendant.

### i. Need of Sentence to Reflect Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment

The first factor in § 3553(a)(2) identifies the retributive function of sentencing. An appropriate sentence should serve to impress upon both the defendant and society at large that the conduct of the defendant is viewed as reprehensible and that such conduct cannot be tolerated. The sentence should serve to promote respect for the law. And the sentence should provide just punishment for the particular conduct.

As the Court stated in *Phelps*, the Court generally will defer to the judgment of Congress and the Sentencing Commission on this point.

> The Guidelines and policy statements also reflect the considered judgment of Congress and the Sentencing Commission as to the weight and relevance of certain generalized criteria in criminal sentencing. Not only are these entities more representative than this Court of the various stakeholders in criminal sentencing (including perhaps most significantly the general citizenry), but they are also in a better position to offer judgments as to the presence and extent of certain traditional sentencing considerations with respect to classes of offenses and/or offenders. For example, it would be quite difficult if not a practical impossibility for the Court or the federal judiciary in general to evaluate and assess the need "to afford adequate

deterrence to criminal conduct" ( *i.e.*, general deterrence) in the context of any given statutory offense. It is neither the purpose nor the province of the federal judiciary to gather evidence, hear testimony, and come to conclusions as to such matters, nor is it this Court's desire to do so. Additionally, with respect to § 3553(a)(2)(A)'s call for sentences which reflect the seriousness of the offense, promote respect for the law, and provide just punishment, the conclusions of Congress and the Sentencing Commission are a much more accurate and consistent (though still imperfect) barometer of the present societal consensus as to these broadly phrased objectives of criminal sentencing than the subjective opinions of this Court on any given day could ever hope to be. Finally, because the nation's district courts are presided over by hundreds of judges sitting in different locales and each operating from their own individual professional and personal backgrounds and experiences, the only feasible way to provide any meaningful uniformity in federal sentencing, as called for in § 3553(a)(6), is for this Court and others to give the advisory Guidelines some degree of enhanced weight in determining a fair, just, and reasonable sentence in a given case.

*Phelps*, 366 F. Supp.2d at 588-89 (internal citations omitted).

In considering the need of a sentence to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment, the Court will look to the nature of the offense of conviction. The Court does not understand Defendant to argue child pornography is not a serious offense. Defendant does argue the images were downloaded over a short period of time, there is no evidence Defendant ever attempted to contact any children, and Defendant made a mistake  (Court File No. 48, p. 9).

It should be beyond dispute that child pornography is a very serious offense. There are very real and serious harms resulting from child pornography. The necessity of strong condemnation of such behavior is also indisputable. General deterrence is a compelling factor in such cases. Child pornography is behavior that takes place in the privacy of one's home or business, as in this case. That makes it very hard to detect and because of this inherent difficulty also makes it very difficult to deter. No one can make light of the seriousness of the crime. Both Congress and the Sentencing Commission have reached this determination. An appropriate sentence must reflect the seriousness

of child pornography.

Federal courts likewise have been almost unanimous in recognizing the harms caused by, and thereby the serousness of, child pornography. A very recent example of this is *Unites States v. Presto*, — F.3d— , No. 05-6888, 2007 WL 2301513 (6th Cir. August 14, 2007), a case which arose out of this district, where a panel of the Sixth Circuit, in rejecting a contention that life time supervised release was disproportionate to the gravity of child pornography, explained the seriousness of child pornography. It began the discussion with quoted language by the United States Supreme Court from *New York v. Ferber*, 458 U.S. 747, 759 (1982):

> The distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways. First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled.

> *New York v. Ferber*, 458 U.S. 747, 759 (1982) (footnote omitted). The Court cited authorities explaining that pornography "poses an even greater threat to the child victim than does sexual abuse or prostitution," and "[t]he victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child." Id. at 759 n.10 (quoting Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L. Rev. 535, 545 (1981); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U. Mich. J.L. Reform 295, 301 (1979))

----F.3d at ----.

The seriousness of child pornography was also recently described by the United States Court of Appeals for the Third Circuit in *United States v. MacEwan*, 445 F.3d 237 (3rd Cir. 2006):

> In evaluating the magnitude of the harm caused by child pornography, we defer to the findings made by Congress. The congressional findings underlying § 2251 repeatedly stress that child pornography "is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved." Congress

33

found that "where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere "existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children." Furthermore, "it inflames the desires of ... pedophiles ... who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials."

*United States v. MacEwan*, 445 F.3d 237, 249-50 (3d Cir. 2006) (internal citations omitted).

The Sixth Circuit in an earlier case reached a similar result in describing the gravity of child

pornography:

Congress clearly considered the children depicted in such materials to be the primary victims. See [*United States v.*] *Boos*, 127 F.3d at 1211 (relying upon the Senate's statement, in Senate Report No. 95-438, 95th Cong. 2nd Sess. (1978) U.S. Code Cong. & Admin. News, p. 40, that "[o]f deep concern to the Committee is the effect of child pornography . . . on the children who become involved . . . . Such encounters cannot help but have a deep psychological, humiliating impact on these youngsters and jeopardize the possibility of healthy, affectionate relationships in the future.").

*United States Hibbler*, 159 F.3d 233, 237 (6th Cir. 1998).

The same point was made by the United States Court of Appeals for the Fifth Circuit in

*United States v. Norris*, 159 F.3d 926 (5th Cir. 1998):

Third, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials. As Congress put it in explicit factual findings: "[T]he existence of and traffic in child pornographic images . . . inflames the desires of child molesters, pedophiles, and child pornographers, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials[.]" Plainly, Congress has described a chicken-and-egg scenario in which it would be impossible to determine whether child pornographers or consumers of child pornography were initially responsible for the creation of the child pornography industry.

*Norris*, 159 F.3d at 930 (internal citations omitted).

Thus a sentence of incarceration is necessary to reflect the seriousness of the offense, for just punishment, and to promote respect for the law.

### ii.    Need of Sentence to Afford Adequate Deterrence

The second factor identifies the deterrent function of sentencing. An appropriate sentence should serve to deter others who might be inclined to commit similar offenses. Such would-be offenders should add the risk of incarceration to their calculation when contemplating whether to engage in this type of conduct. This is also a function for which the Court is not as well equipped as Congress and the Sentencing Commission in determining what precise sentence will deter those in the general public inclined to commit such offenses. *Phelps*, 366 F. Supp.2d at 588.

Deterrence is a particularly relevant consideration in child pornography cases. The United States Court of Appeals for the Seventh Circuit recently had occasion to discuss this consideration. It pointed out:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. *E.g., Osborne v. Ohio*, 495 U.S. 103, 109-11 (1990); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006); *United States v. Richardson*, 238 F.3d 837, 839 (7th Cir. 2001); *United States v. Angle*, 234 F.3d 326, 337-38 (7th Cir.2000). Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced.

*United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007).

The Third Circuit agreed with the reasoning in *Goldberg* and pointed out that deterrence should be given "significant weight at sentencing." *United States v. Goff*, No. 05-5524, — F.3d —, 2007 WL 2445637 (3d Cir. Aug. 30, 2007).

At Defendant's sentencing hearing, the Court noted that cases involving possession of child pornography generally take place in private, making them easy to commit and difficult to detect. Therefore, deterrence is at a premium. If Defendant, with his high intellect, social status, and income, and with so much to lose, is not deterred, then who will be deterred. The Sixth Circuit recently stressed the importance of deterring the "normalization of child pornography," and approvingly quoting a district court, which had described the sentence imposed on a defendant as adequately deterring others who "may think that because they are on the Internet in their home that they are doing something that is innocent." *United States v. Kirchhof*, No. 06-5203, — F.3d —, 2007 WL 2827572, *5 (6th Cir. Oct. 2, 2007).

### iii. Need of Sentence to Protect the Public from Further Crimes of the Defendant

The third factor identifies the incapacitative function of sentencing. An appropriate sentence should serve to prevent the particular defendant from committing such crimes while incarcerated. Unlike the first two factors, this is a factor the Court is better able to evaluate than Congress and the Sentencing Commission. In *Phelps* the Court explained:

> Of course, . . . it is also true in that there are certain traditional sentencing considerations which the Court is uniquely capable of assessing and weighing in a given case (e.g., the need to protect the public from further crimes of a particular defendant, the need to provide a particular defendant with vocational training, medical care, and/or correctional treatment, and the need to provide restitution to any victims).

*Phelps*, 366 F. Supp.2d at 589 n.4.

Defendant is not a violent person. The Court does not question Dr. Glennon's opinion that Defendant is not likely to make contact with children. However, Dr. Glennon also opined Defendant is a moderate to high risk to reoffend, that is, commit future acts of receiving child pornography.

Defendant's conduct that led to his indictment along with his conduct after his release on bond demonstrates he has great difficulty restraining himself from committing this offense. Defendant's high intellect, self image, desire to retain the respect of his community, the risk of the loss of his family, friends, spouse, his professional license and standing, and high income were not sufficient to enable him to resist the urges he had to indulge in this behavior.

It also gives the Court some pause that Defendant's social support system may not help him restrain himself. One of the factors the Court takes into account is the strength of a defendant's social support system and whether in the judgment of the Court this support system is likely to assist the defendant in refraining in engaging in the same conduct. Two of the letters written on Defendant's behalf came from his sister and his office manager. Both were also involved in Defendant's obstructive behavior. In some sense they were enablers and not sources of restraint for Defendant.

The extent of social support to act as restraints upon a child pornography defendant is a recognized factor in sentencing post-*Booker*. In *United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007), the court reviewed the actions of the sentencing judge in imposing a non-Guidelines sentence upon a defendant convicted of child pornography in part because of "the positive role [Defendant's] family members, who promised to aid in his rehabilitation and reintegration into the community and support his efforts to avoid reoffending." *Wachowiak*, 2007 WL 2189561 at *3. In that case, Defendant's sentencing guidelines suggested a sentence of 121 to 151 months while the sentencing judge imposed a sentence of 70 months. *Id*. at *1.

This is a factor this Court has considered in previous cases of this type. Where the Court has found strong social support from family, friends, and others the Court has deemed a lower sentence

appropriate. Numerous letters were written on Defendant's behalf, mostly from former patients who extolled his virtues as a doctor, as opposed to close friends. The lack of indication that Defendant has strong social support and his possession of child pornography after being arrested for possessing child pornography explain the need for incapacitation.

### iv. Need of Sentence to Provide the Defendant with Needed Rehabilitation

The fourth factor identifies the rehabilitative function of sentencing. This is a factor the Court is better able to assess. *See Phelps*, 366 F. Supp.2d at 589, n.4. Although the Court thinks Defendant is in need of rehabilitative assistance, i.e., sex abuse treatment, the Court is also confident Defendant will receive needed treatment while serving a prison sentence. Dr. Glennon indicated Defendant could benefit from such treatment.

## III. CONCLUSION

For the foregoing reasons, the Court imposed a 135 month sentence of imprisonment and a term of supervised release for life (Court File No. 75).

**SO ORDERED.**

**ENTER:**

**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**